1
2
3
4
5
6

IN THE UNITED STATES DISTRICT COURT

7

FOR THE DISTRICT OF ARIZONA

8

9    United States of America,                    CR15-01632-TUC-RM(JR)

10                        Plaintiff,        **REPORT AND RECOMMENDATION**

11            vs.

12
     Prince Anthony James Kelly,
13                        Defendant.

14

15

16          On December 11, 2015, Defendant filed a Motion to Suppress Statements and

17   Request for Voluntariness Hearing (Doc. 35).   The government filed a response on

18   December 30, 2015 (Doc. 45) and the Defendant filed a Reply on January 15, 2016 (Doc.

19   52).   Also on December 11, 2015, Defendant filed a Motion to Suppress Identification

20   Evidence (Doc. 36).   The government filed a response on December 31, 2015 (Doc. 46)

21   and the Defendant filed a Reply on January 15, 2016 (Doc. 51).   Both motions were

22   heard by Magistrate Judge Rateau on February 1 and 5, 2016, and March 1, 2016.[1]

23
24
25
26
27

28

---

[1] The hearing was delayed due to the illness of the Government's case agent.

The Defendant voluntarily absented himself from portions of the proceedings, but was otherwise present and represented by counsel.   The Government presented three witnesses and the Defendant presented one.   Three Government exhibits and nine Defense exhibits were admitted at the hearing.   Having considered the matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law and recommends that Defendant's Motion to Suppress Identification Evidence be granted and that the Motion to Suppress Statements be denied.

## I.      FINDINGS OF FACT

### A.      The events of March 24, 2015

On March 24, 2015, Jennifer Stark was working at Saguaro Firearms, a Sierra Vista, Arizona, gun store owned by her brother.  TR2:2-3, 90.  The store is located on Fry Boulevard near the Ft. Huachuca military base and the typical customers are military personnel and ranchers.  TR2:5-6.  The store is well lit with fluorescent lighting and natural light coming from large windows.  TR2:7-8.  The store is also equipped with a video surveillance system that consists of two cameras that can be remotely activated and monitored. TR2:64-65.  Both of the cameras are pointed toward the sales counter, but due to the then recent rearrangement of the store, "were both so far away that they were pointless."  TR2:66.

On the morning of March 24, 2015, Stark was working in the gun store when two men entered the store, one an African-American (referred to herein as "the Suspect"), who is alleged to be the Defendant, and the other a Caucasian, later identified as Matthew Androsky.   TR2:4, 95.   Stark described the Suspect as a "muscular and broad

shouldered," "tall, dark-skinned black male.  He was wearing a red ball cap, a red jersey, red basketball shorts, and red shoes."  TR2:97, 130.  She recalled the jersey as being short sleeved, worn untucked and being "silky."  TR2:99.  She described the red shorts as "long and baggy down to his knee."  TR2:99.  Neither the jersey nor shorts had any markings on them, but were "plain red."  TR2:99.  Stark did not recall the Suspect having any tattoos.  TR2:107-08.  She recalled that the second man, Androsky, had fresh tattoos and was wearing saggy pants.  TR2:4.

The two men drew Stark's attention primarily due the Caucasian male's appearance, which Stark described as "thug."  TR2:5.  The men went to the handgun counter at the store where they remained for 30 or 40 minutes.  TR2:9, 11.  Both the Suspect and Androsky looked at 8 to 10 handguns each, which Stark handed to them. TR2:10-11.  Stark engaged in pleasant conversation with both men but also watched them closely to insure that the gun magazines did not get stolen and to make sure the guns remained unloaded.  TR2:11-13.

Eventually, Androsky decided to buy a firearm and Stark asked him if he wanted to fill out a "White Form," which is the ATF Form 4473 required to be completed for over-the-counter firearms transactions.    TR2:16; Ex. D-55 (Firearms Transaction Record/ATF Form 4473).  Androsky then completed Form 4473 as the Defendant and Stark stood nearby.    TR2:17.    After the form was completed, Stark requested identification from Androsky and made sure that the photo on the identification, which she believes was a driver's license, was of Androsky and made sure the information on the license matched the information on the Form 4473.  TR2:19.  Once the form was

completed, Stark called the Federal Bureau of Investigation's National Instant Criminal Background Check System ("NICS") and received a "proceed" response allowing Androsky to purchase the weapon.  TR2:20-21.  Stark then completed the sale to Androsky, who paid for the gun with four $100 bills that he "peeled off the bottom" of a neatly arranged "wad of cash" he was carrying in his pants pocket.  TR2:21, 33-34.

After Stark completed the sale to Androsky, the Suspect indicated that he too wanted to make a purchase.  TR2:22-23.  He identified the handgun he wanted and "pulled out his stack of cash which was messy."  TR2:34-35.  Stark provided him with a copy of the ATF Form 4473 which he began to complete, but then said that he had "goofed" or "messed up" by writing his first name in the last name block.  TR2:23, 36. She then gave the Suspect a second Form 4473, but he then decided he did not want to purchase the gun at that time, but said he had to go count his money.  TR2:24-25, 36-37. Androsky and the Suspect exited the shop.  TR2:37.  Androsky then returned alone to the shop 30 or 40 minutes later and, after about 10 minutes, left the store again.  TR2:37.

At about lunchtime that same day, the Suspect returned to the store accompanied by another African American man, dressed in white basketball shorts and a silky jersey, who was about the same height and build as the Suspect.  TR2:37-38, 112.  The Suspect asked to buy the gun he had chosen earlier in the day, a Jimenez 9 millimeter pistol. TR2:40. Stark said "White Form," and they both chuckled about the previously discarded form which was still on the counter behind Stark.  TR2:41.  Stark then provided the Suspect with a new Form 4473 and he again proceeded to place his first name in the last name block.  TR2:42-43.  Stark placed the second form on top of the first and then

- 4 -

provided the Suspect with a third form.  TR2:43.  The Suspect proceeded to complete the form, reading the questions aloud and checking the boxes.  TR2:45; Ex. D-55 (Completed Form 4473).

The questions on Form 4473 are numbered 11(a) through 11(l) and, except for question 11(a) which requires a "yes" answer, all require a "no" answer for the sale to proceed.  TR2:46.  The Suspect checked the "yes" box for question 11(b), which asks if the purchaser is under indictment for a felony. TR2:46-48.  Stark noticed the Suspect's answer and stated, "Please read the question carefully and answer to the best of your ability."  TR2:48.  The Suspect then started reading portions of the questions aloud and, "goofing off" or joking manner, proceeded to say "yes" after each question while marking "no" on the form.  TR2:49-50, 115, 168.  When he completed the form, Stark showed him where he needed to sign and date the form.  TR2:50-51.  She then watched the Suspect sign the form and then completed the portions she is required to complete, including the type of gun and the type of identification, which in this case was an Arizona identification card with the Defendant's name on it, Anthony Kelly (the "Kelly ID"). TR2:51-52; Ex. D-55 (Form 4473).

Stark then called NICS and provided them the information on the form while the Suspect stood across the counter looking at the gun which was still on the counter. TR2:52-53, 119.  The response from NICS was a "delay," indicating that the application required "further review," and Stark was given a NICS transaction number.  TR2:53-54, 120.  She wrote the transaction number on the form and was placed on hold for two or three minutes.  TR2:54.  Because he might get a "deny" rather than a "proceed," Stark

picked up the gun and moved it away from the counter and placed it on a chair.  TR2:54-55.  She told him that NICS gave her a "further review" and the Suspect "lost his smile."  TR2:55.  After waiting on hold, NICS gave her a "delay," meaning that he would have to wait five days before purchasing the weapon.  TR2:56.  When she informed the Suspect of the delay, the man with him said "I'll fill out a White Form," and Stark replied, "That's not how it works."  TR2:58.  Stark then told the Suspect that he could place a deposit on the gun if he wanted her to hold it, or he could select another gun "when you go through."  TR2:56-57.  The Suspect had a look of concern and Stark asked him for his phone number so she could call him if she got a "proceed" notification from NICS.  He then gave her his phone number and, along with the man that was with him, left the store.  TR2:57, 59-60.

Less than 30 minutes later, the Suspect reentered the store again accompanied by the African American man he was with previously.  TR2:60-61.  In a demanding tone, the Suspect said that he wanted the Form 4473 back.  TR2:61-62.  Stark told him that the form was "now federal property" and that she could not return it to him.  TR2:62.  She recalls him reacting by placing his hands on the counter in a way that made her believe he was about to jump over the counter at her.  TR2:62-63, 129.  Because she was nervous, she stepped back from the counter and somehow texted the word "video" to her brother so that he could "hit the 'record' button on the security camera."  TR2:63-64.  At that point, she recalls that the man with the Suspect grabbed the Suspect's sleeve or arm and pulled the him off the counter and guided him out of the store.  RT2:66-67.  After the men left the store, Stark saw that they were headed in the general direction of another gun

store down the street.  TR2:67.  She called the other store to warn them that the man dressed in white had just tried to make a straw purchase.  TR2:68.

Then, the Suspect and the African American man dressed in white once again entered the store, this time followed by a smaller African American man and a Caucasian couple.  TR2:69.  Stark recalls that the smaller African American male had the word "Jennifer" tattooed in black cursive on his neck "[a] couple of inches below the ear." TR2:131-32, 145.  As Stark was watching and listening to them, the Suspect told the smaller African American man that he had tried to purchase a gun but had been given a "delay."  The smaller man then said, "I have a 380 at home, you can buy it from me." TR2:70-71.  The Suspect then said, "Yes, let's do that."  TR2:71.  Stark, who believed she had just witnessed a crime, was "in disbelief" and "dumbfounded," and texted the message "more video" to her brother, but did not otherwise say anything.  TR2:72, 76. All five in the group then exited the store.  TR2:72.  Stark began to head around the counter to see if they were in a vehicle that she could identify because she had decided she was going to call law enforcement.  TR2:72.  However, the Caucasian woman reentered the store and Stark retreated behind the counter.  TR2:72-73.  The woman placed her elbows on the counter, looking straight ahead and saying nothing.  TR2:74. Stark asked her if she needed anything, if she was okay and if she was safe, and the woman responded, "No, I just have to stand here for a minute" or "stay here for a minute."  TR2:73-74.  After four or five minutes, the woman left the store without saying a word.  TR2:74-75.  Stark, who described herself as "exasperated," sat down and, within a few minutes, called Mike Naylon from the ATF.  TR2:75.

**B.     The investigation by ATF**

**1.     The photo lineup**

A few weeks later, Stark was contacted by and met with Agent Heather Cox-McLain from the ATF for an interview and to review a photo lineup.   TR2:76-78; TR4:21.  When they met, Stark provided an account of what had happened and the agent asked Stark if she could identify the Suspect in a photo lineup.  Agent Cox-McLain had contacted Dennis Fasciani to prepare a photo lineup to show Ms. Stark. TR1:12-13; TR4:21.  Fasciani is an Intelligence Research Specialist who has been employed by the ATF for almost 17 years.   TR1:3.   As an Intelligence Research Specialist, Fasciani provides tactical and strategic support to agents in the ATF's Tucson Field Office. TR1:3.   His work involves computer research designed to identify phone numbers, addresses, email addresses, photographs and criminal histories.  TR1:3-4.

Fasciani has had no training related to the creation of lineups, the reliability of an identification, the science of perception, the effects of lighting, lineup bias, or the differences between six-pack and sequential presentation of photos. TR1:25.  Rather, he was informally trained by two personnel in the ATF office.  TR1:26.  The training consisted of instruction on how to access the Arizona Department of Motor Vehicles ("DMV") database, create the search parameters, and "what to look for in order to create the six-pack." TR1:26.

In this case, Agent Cox-McLain asked Fasciani for a two row, six photo, photographic lineup, known as a "six-pack."  TR1:4.  Agent Cox-McLain provided Fasciani the information from the Kelly ID used by the Suspect.  TR1:21.  With that

information, Fasciani retrieved a photo of the Defendant from the DMV's driver's license data base.  TR1:4-5, 9, 14, 27, 29-30; TR4:21.  He placed Defendant's photo in the top left position, which he referred to as "position one," of the six-pack and then entered search parameters, including race, hair color, eye color, age range, and whether they are wearing glasses, into the same DMV database to identify other similar looking individuals.  TR1:5-8, 14-15, 48; Ex. 2 (lineup search settings screenshot).  From that query, which returned 250 photographs, Fasciani narrowed the photos down to five based on significant features similar to those of the Defendant, such as head shape and hair type and color.  TR1:5, 16, 20; Ex. 3 (search results screenshot).  Fasciani does not alter or Photoshop the photos before placing them in the six-pack.  TR1:7.

All of the photos included in the six-pack Fasciani created in this case came directly from the DMV system.  TR4:22.  Depending on the DMV office that took the photo, the photos varied in background colorings (such as white, light gray, dark gray, lavender, and light blue), and how close the subject is in the photo.  TR1:17-19; Ex. 1 (six-pack).  When creating the six-pack, Fasciani did not focus on these variations, but focused on the facial characteristics of those included.  TR1:19-20.  For example, he was not focused on the variation among the backgrounds of the photos included in the six-pack and did not notice that the only blue background was in the Defendant's photo.  TR1:37, 42, 46-47.  Similarly, it did not concern him that the individuals in the top row of photos had no facial hair while the three on the bottom row did, or that the photo in position one, which is the Defendant, was wearing jewelry.  TR1: 40-42.

Prior to reviewing the lineup, Stark was told that the Suspect may or may not be in the lineup and that it was okay if she could not identify him.  TR2:79, 150; TR4:22-23.  Stark then looked at the six-pack and quickly eliminated the four photos in Positions 2 through 5.  TR2:80-81, 152; TR4:24.  However, she was stuck on the photos on the top left (or Position 1) and the bottom right (or Position 6) and looked at them for what "[s]eemed like forever."  TR2: 80-81; TR4:24.  As she explained, "No. 1 had the right features but No. 6 had the right expression," which she described as "smiling and he looks kind of stoned."  TR2:81, 154.  She "crossed off the other four immediately" by marking them with blue marks.  TR2:81-82; Ex. 1.  Stark said that the Suspect was wearing a ball cap when she saw him, which prompted Agent Cox-McLain to hold a file folder over the foreheads of the men in Positions 1 and 6 in an effort to mimic what they would look like wearing caps.  TR2:83, 88, 152-53, 165-66.  Ultimately, although she was pretty certain it was one of them, Stark could not decide between the two photos that she had not ruled out.  TR2:83, 154.  Stark signed the six-pack and dated it April 23, 2015.  TR2:80; Ex. 1.

Subsequent to her meeting with Agent Cox-McLain and before the hearing on the motions now before the Court, Stark contacted her brother and told him that she had been subpoenaed for the hearing and for trial.  TR2:84.  Her brother then sent her a message asking, "Who is this guy?," and containing a link to a newspaper article and two arrest photos, one of a man and one of a woman.  TR2:84; TR4:25-26.  Stark first recognized the woman as the same woman who had entered the gun store with the Suspect and who had returned and placed her elbows on the counter for several minutes.  TR2:85.  She

then looked at the other photo and positively recognized him as the man in the store and saw that he was identified as "Prince Anthony Kelly" in the story that accompanied the photos. TR2:85-86; Ex. D-107 (story and photos). After seeing the photos, Stark felt uncomfortable because she had been subpoenaed to possibly identify the Defendant in court, and she recalls that she deleted the message from her brother and contacted Agent Cox-McLain to tell her what had happened. TR2:86-87; TR4:26. But Agent Cox-McLain recalls that she requested that Stark send the link to the agent and recalls that Stark did so. TR4:26-27; Ex. D-107.

### 2.     The video clips

As part of the investigation, Stark assisted Agent Cox-McLain in getting a copy of the surveillance video that was taken in the store that day. TR2:133; Ex. D-90 (copy of surveillance video). The video consists of three clips. The first clip is labeled "Network Camera2" and is time stamped from 14:56:33 to 14:57:20. The camera is pointed toward the sales counter. The clip shows two African American males from behind looking at items in a glass display while Stark talks on the telephone. The men are of similar size and build. One is wearing a red baseball cap backwards, a white t-shirt, baggy jeans and dark-colored tennis shoes. The other man is in a dark colored baseball cap, a black shirt, and dark-colored long pants. Stark is on the phone at the check-out counter for the entirety of the video and only once briefly looks over toward the two men.

The second clip is labeled "Camera 1" and is time stamped from 14:57:10 to 14:57:59. The camera is positioned to the side of the sales counter and shows the same two men from the first clip. The man in the white shirt appears to be interacting with

Stark, who is still on the phone, while the man in the black shirt continues to look at items in the glass display.

The third clip is also labeled "Camera 1" and is time stamped from 14:59:42 to 15:00:30.  It is taken from the same side angle as the second clip.  In addition to Stark, who is behind the sales counter, and the two men from the first two clips, there is a smaller African American male dressed in a white t-shirt, blue baggy shorts, and dark colored shoes, and a Caucasian woman dressed in a long, loose-fitting black dress.  All four of the customers appear to be looking at items in the glass display case and Stark removes something from the case, which appears to be a weapon, and hands it to the man in the red baseball cap and white shirt.

## C.    The transport

Agent Cox-McLain presented the case by Complaint and obtained a warrant for the Defendant's arrest.  TR4:6.  On August 17, 2015, Agent Cox-McLain learned that she would be serving the warrant and picking up the Defendant the following day at the Cochise County Detention Center in Bisbee, Arizona.  TR4:6-7; TR3:6.  At 7:00 or 7:30 the following morning, she picked-up Special Agent Darren Clemons in Benson, Arizona.  Before heading to Bisbee, the two stopped at the McDonald's in Benson and bought breakfast for themselves and a sausage biscuit with the idea that the Defendant might want it "since he's been in jail for a couple of months."  TR4:7-8; TR3:6-7.  They then drove for about an hour to the Cochise County Jail.  TR4:8.

When the agents arrived at the jail, they pulled into the sally port, secured their weapons, walked in and waited for the Defendant to be brought up.  TR4:8; TR3:8.

When the Defendant arrived, the agents explained to him that they had an arrest warrant for him and that they would be taking him to federal court in Tucson.  TR4:9.  He was not read his *Miranda* warnings because, as Agent Cox-McLain explained, "this was merely a transport to bring him to federal court.  It was never an interview."  TR4:19; TR3:42.  The Defendant was then fingerprinted, a DNA swab was taken, and Agent Clemons placed him in shackles and handcuffs.  TR4:9; TR3:9-10, 29.  The process took about 15 to 30 minutes.  TR4:10; TR3:9.

The agents then took the Defendant from the secured area of the jail out to Agent Cox-McLain's vehicle and placed him in the front seat and put his seatbelt on.  TR4:10; TR3:10.  Agent Cox-McLain got in the driver's seat and Agent Clemons got in the rear seat directly behind the Defendant.  TR4:10-11; TR3:11.  The group then departed toward Tucson and Agent Cox-McLain explained to the Defendant that he was being transported to the federal court in Tucson where he would be transferred into the custody of the United States Marshal's Service, meet with pretrial services, and then appear before a judge at around 2:00 p.m.  TR4:11.

After going through the process, Agent Cox-McLain gave the Defendant a copy of the arrest warrant and explained the charges against him.  TR4:12-13.  She told him that he was being charged with providing a false statement in connection with the purchase of a firearm, and specifically that he had checkmarked "No" when the question was, "Have you ever been convicted of a previous felony?"  TR4:12-13.  The Defendant responded that he "thought he was good once he was off paper," meaning once he was no longer on parole.  TR4:13; TR3:15.  Agent Cox-McLain told him that was not necessarily true and

that he would have to receive a pardon or have his rights restored.   TR4:13.   The Defendant then conveyed that it was not a big problem because it was a misdemeanor or petty charge, and Agent Cox-McLain corrected him explaining that it was a felony charge for which he could be sentenced to up to ten years in prison.   TR4:13-14; TR3:13.   The Defendant responded, "Oh, I guess this one's on me.   I didn't know I could get in trouble for trying to buy a gun," TR4:14, and said that "it was just a piece of paperwork" and that he did never picked up the gun, TR3:13-14.   She then asked him if he had any questions or if he had anybody he would like the agents to call to meet him at the federal court. After initially indicating there was someone he wanted them to contact, the Defendant changed his mind and told Agent Cox-McLain not to call anybody.   TR4:15.

Agent Cox-McLain recalls that she offered the Defendant the sausage biscuit and some water, which he accepted, after he had made the statements about being "off paper."   TR4:16, 48.

There was then some small talk about the Defendant's family and then the Defendant offered the agents information related to a story about some Sierra Vista police officers that had been in the news due to corruption allegations that resulted in the dismissal of the charges for which he was being held at the Cochise County Jail. TR4:17-18.   After talking about the officers for a few minutes, Agent Cox-McLain told the Defendant that she would pass the information on to the FBI, but that it would be best in his best interest if he talked with an attorney before going any further with the discussion.   TR4:17-18; TR3:20.   The conversation then "slacked off" as they drove toward Tucson.   TR4:20.

When the group reached Tucson, the marshals processed the Defendant and then the agents escorted him to his interview with pretrial services. TR4:20. After seeing pretrial services, the Defendant was returned to the custody of the marshals and that ended Agents Cox-McLain and Clemons' time with the Defendant. TR4:20.

## II. <u>CONCLUSIONS OF LAW</u>

### A. Identification

The Defendant contends that the six-pack lineup was impermissibly suggestive. Due process concerns arise when law enforcement officers "use an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, 132 S.Ct. 716, 724 (2012); *United States v. Jones*, 84 F.3d 1206, 1209 (9th Cir. 1996) (citing *Neil v. Biggers*, 409 U.S. 188, 198 (1972)); *Foster v. California*, 394 U.S. 440, 442 (1969) ("judged by the 'totality of the circumstances,' the conduct of identification procedures may be 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to be a denial of due process of law." The Court conducts a two-step inquiry to determine whether due process prohibits the introduction of an out-of-court identification at trial. *Perry*, 132 S.Ct. at 722, 730. First, the Court must determine whether law enforcement used an unnecessarily suggestive identification procedure. *Id*. If they did, the Court must decide whether the improper identification procedure so tainted the resulting identification as to render it unreliable and therefore inadmissible. *Id*.

Addressing the first prong in the context of photo line-ups, "[a]n identification procedure is suggestive when it "emphasize[s] the focus upon a single individual thereby increasing the likelihood of misidentification." *United States v. Montgomery*, 150 F.3d

983, 992 (9th Cir. 1998) (quoting *United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985).   Whether an identification procedure was unduly suggestive is a fact-specific determination, which may involve consideration of the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves.   *Bagley*, 772 F.2d at 493.

Here, there are several factors that made the six-pack used in this case unduly suggestive.   Significantly, neither Fasciani nor Agent Cox-McLain ever received any training about creating or conducting a photo lineup.   TR4:60; TR1:26.   As a result, Fasciani used the same DMV photo in the six-pack that appeared on the Kelly ID used in the gun store.   TR4:64-66.   That, of course, was a photo that Stark had already seen. Despite the fact that Fasciani was aware that a gun purchaser might show the seller a DMV identification, it never occurred to him that there might be a problem with using a DMV photo that may have already been involved in the case.   TR1:33-34.   Certainly, using a photo of the suspect that a witness has already seen, along with five other photos she has never seen, is unduly suggestive and increases the likelihood that the witness, rather than relying on her recollection of the appearance of the person who provided the identification, will select the previously viewed photo.

The details of the photo also make it suggestive.   The Defendant was the only individual in the six-pack with a necklace.   Although there is no evidence that Stark ever reported to Agent Cox-McLain that the Suspect was wearing a necklace, it appears she was never asked.   However, at the hearing, when asked on cross-examination if the person who had given her the Kelly ID wore any jewelry, Stark responded that the

question was "unfair" because her memory that he was wearing a "gaudy gold necklace" was triggered by the photo in the six-pack in which the Defendant is wearing a gold chain. TR2:157. Even if Stark did not consciously notice the necklace when she was reviewing the six-pack, even she recognizes it was unfair to use such a picture. The distinctive nature of a "gaudy necklace," coupled with the fact that none of the other individuals in the photo are wearing jewelry, contributes to the photographic lineup being unduly suggestive.

The defense also points out that the Defendant was placed in "position one" in the six-pack and his is the only photo with a bright blue background. Stark testified that she did not notice the blue background or that the Defendant's was the only photo with the blue background. TR1:37. Although the Ninth Circuit has found that a photo array is not unduly suggestive merely because there are differences such as these among the photographs, *see, e.g., United States v. Burdeau*, 168 F.3d 352, 357 (9th Cir.1999), particularly when viewed in conjunction with the use of the photo from the Kelly ID, these otherwise insubstantial differences between the Defendant's photograph and the others presented to Stark certainly draw attention and contribute to creating an impermissible suggestion that the Defendant was the Suspect that was in the store. Thus, under the totality of the circumstances, the Court finds that the lineup procedure was unduly suggestive and raises due process concerns.

An unduly suggestive identification procedure does not result in automatic exclusion. Instead, the Court must move to the second prong of the inquiry and "screen the evidence for reliability pretrial. If there is 'a very substantial likelihood of irreparable

misidentification," the judge must disallow presentation of the evidence at trial.  But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth."  *Perry*, 132 S.Ct. at 720 (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968)).  This inquiry requires the court to determine whether the totality of the circumstances surrounding the eyewitness's identification indicates that the identification was nonetheless reliable.  *Neil v. Biggers*, 409 U.S. at 199; *Simmons*, 390 U.S. at 383.

The Supreme Court has identified several factors, known as the *Biggers* factors, that are relevant to the assessment: (1) the opportunity of the witness to observe the defendant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of any prior description by the witness; (4) the witness's level of certainty at the confrontation; and (5) the length of time between the crime and the identification. *Biggers*, 409 U.S. at 199–200; *Perry*, 132 S.Ct. at 725 n.5.  Where "the indicia of reliability are strong enough to outweigh the corrupting effect of the police arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth."  *Perry*, 132 S.Ct. at 720.  Here, however, the indicia or reliability are not strong and the identification evidence should not be submitted to a jury.

As the recitation of the facts establishes, Stark had multiple opportunities to observe the Suspect at the time of the crime.  The Suspect came into the store four times. However, Stark's degree of attention was lacking.  As illustrated in the video clips, Stark,

even when she would be expected to have a heightened degree of attention, did not spend much time looking at the Suspect or others.  In the video clips, Stark is on the phone or at the register and paying no attention to the Suspect or the people with him.  In the first video, Stark looks up only briefly and then looks back down.  TR2:141-42.  In fact, throughout the three videos, she only briefly walks over to the display counter and pulls an item out and then returns to the register area.  Thus, although she had the opportunity to view the Suspect, she largely was inattentive.

The accuracy of Stark's description of the Suspect immediately after the incident is impossible to evaluate.  At the time, Agent Cox-McLain did not ask Stark for an independent description of the suspect who used the Kelly ID.  TR4:82.  In her statement, Stark refers to the Suspect as "Anthony Kelly," but never provides a description.  *See* Ex. D-63.  Similarly, in Agent Cox-McLain's report on the incident, no description of the Suspect is provided.  *See* Ex. D-62.

Although no detailed description was recorded around the time of the incident, Stark was questioned at length about the Suspect's appearance at the hearing on this matter.  She testified that he was wearing a red ball cap, a red jersey, red basketball shorts, and red shoes.  TR2:97, 130.  She recalled the jersey as being short sleeved, worn untucked and being "silky."  TR2:99.  She described the red shorts as "long and baggy down to his knee," TR2:99, and recalled that neither the jersey nor shorts had any markings on them, but were "plain red."  TR2:99.  Contrary to Stark's testimony, the video shows that the man she identified as the Suspect was not wearing a red silky shirt, red shorts, or red shoes, and Stark admitted that "[i]t seems I'm mistaken about clothing."

TR2:140-41.  Stark also did not recall the Suspect having any tattoos.  TR2:107-08.  The Defendant has a tattoo of the name "Sandra" on is neck.  TR4:91; TR3:42; Ex. D-101; Ex. D-104.

Stark's level of certainty also weighs in favor of exclusion.  At the time she viewed the six-pack, she could narrow her identification of the Suspect down to two of the six photos.  This is the case even though she was given ample time and was aided by Agent Cox-McLain who placed a folder over the final two photos in an attempt to replicate what the men would look like when wearing baseball caps.  In fact, even as of the day of the hearing, Stark indicated that she could distinguish between the photos in Positions 1 and 6 on the six-pack only because she had seen the newspaper article her brother had sent her.  TR2:155; TR4:72-74; Ex. D-107; Ex. D-93 (enlarged photo).

Twenty-nine days elapsed between the crime and the six-pack identification.  In a case involving a similar delay between the crime and the photographic identification, the Supreme Court found that other indicators of accuracy and reliability strongly outweighed any possible effect of impermissible suggestion.  *See Biggers*, 409 U.S. at 201 (balancing factors and finding identification on the whole to be reliable).  Here, however, the other factors do not outweigh the possible effects of impermissible suggestion.  Particularly concerning are the use of the photo from the Kelly ID.  It is impossible to know with certainty the impact the use of the Kelly ID had on Stark's ability to narrow her identification of the Suspect to two of the six individuals included in the six-pack.  But, given that the agents obtained no independent description of the Suspect from Stark by which the reliability of her identification could be judged, and that

elements of Stark's recollection of the detail of the events that day and the clothing worn by the Suspect were clearly inaccurate, there are no other indicators of accuracy and reliability that strongly outweigh any possible effect of impermissible suggestion. Accordingly, the Court recommends that the line-up identification be suppressed.

The Court additionally recommends that any in-court identification by Stark of the Defendant be precluded. Although a witness's failure to identify a defendant in a pretrial photo line-up does not automatically result in any in-court identification being unduly suggestive, *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995), under the *Biggers* factors discussed above, Stark's independent recollection of the Suspect is questionable based on her admitted inattention and inability to remember his clothes. TR2:141-44. In relation to the clothing and the order of events, she admitted that she had "some mismatched information. Some mismatched memory." TR2:144. Given the suggestiveness of the line-up, and particularly the use of the Kelly ID, any subsequent identification by Stark would be unreliable.

Moreover, although it was not brought about by state action, *see Perry v. New Hampshire*, 132 S. Ct. 716, 727-28 (2012) (due process violation only implicated where suggestiveness of identification resulted from state action), Stark's accidental viewing of the newspaper article and photo her brother had sent her render any in-court identification unreliable. That photo, because it was associated with a report of the Defendant's arrest and was accompanied by a photo of the woman Stark recalled was also in the store, was not just clearly suggestive, but clearly stated that the Defendant had been accused of a crime. As Stark admitted, she could distinguish between the photos in Positions 1 and 6

on the six-pack only because she had seen the photo in the article.  TR2:155.  Obviously, any subsequent identification of the Suspect by Stark would also be tainted by her viewing of the article and photo.  As such, the probative value of any in-court identification would be substantially outweighed by its prejudicial impact or potential for misleading the jury.  *See, e.g.,* Fed. Rule Evid. 403.  Therefore, in addition to finding that the presentation of Stark's identification testimony to the jury would violate due process, it would also be unfairly prejudicial to allow identification testimony that was tainted by Stark's inadvertent viewing of the article and photo.

### B. Statement

Before a person is questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way," he must first be warned that he has the right to remain silent, that any statements he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed.  *Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966).

Here, the parties do not dispute that the Defendant was "in custody" for purposes of *Miranda* during the time he was being transported from Bisbee to Tucson.  It is also not disputed that he provided self-incriminating statements.  He stated that he "thought he was good once he was off paper." TR4:13; TR3:15.  He also admitted responsibility by stating that, "Oh, I guess this one's on me.  I didn't know I could get in trouble for trying to buy a gun." TR4:14.  And, finally, he said that "it was just a piece of paperwork" and he never picked up the gun.  TR3:13-14.  Because these statements were self-incriminating and made while in custody, the question before the Court is whether Agent

Cox-McLain or Clemons prompted the statements with "either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).

Because the agent's discussion with the Defendant did not contain express questions, the discussion cannot be characterized as an interrogation in the traditional sense, but must be evaluated under *Innis*. There, the Supreme Court described the "functional equivalent" of questioning as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. at 301.

The Government notes that the Defendant made the "off paper" statement not as the result of any questioning or functional equivalent, but in response to Agent Cox-McLain providing him a copy of the warrant listing the charged offense. Similarly, the Government points out that the Defendant made his "this is on me" statement only after the agents corrected his incorrect belief that the charges were minor and told him that the offense was a felony and carried a ten year penalty.

In reply, the Defendant contends that the agents befriended the Defendant by treating him well and giving him a sausage biscuit and then prompted him to discuss the case by telling him that he was facing felony charges carrying a ten year sentence. In support of his argument, the Defendant cites *United States v. Foster*, 227 F.3d 1096 (9th Cir. 2000), *United States v. Booth*, 669 F.2d 1231 (9th Cir.1981) and *United States v. Disla*, 805 F.2d 1340 (9th Cir. 1986). While the Court largely agrees with the Defendant that the agents should have, and quite easily could have, given him his *Miranda* warnings when they picked him up in Bisbee, the cases he relies on do not support suppression of

his statements.

In *Foster*, Foster had been arrested, been provided his *Miranda* warnings, and had invoked his right to counsel. 227 F.3d at 1098-99. Nevertheless, the arresting officer continued to question Foster to obtain biographical information which led to Foster engaging in conversation with the officer and making several incriminating statements. *Id.* at 1099. Foster sought suppression of his statements, arguing that the officer had exploited him by talking about his interest in guitars and music, thus causing him to make the statements. *Id.* at 1103. The court stated that the hurdle Foster faced in establishing that the officer's conversation was the functional equivalent of questioning was "quite high." *Id.* at 1104. The court then found under the *Innis* standards, the conversation Foster engaged in did not constitute interrogation and could not be characterized as playing upon Foster's weaknesses. *Id.*

In *Booth*, shortly after a bank robbery, a police officer observed Booth walking in an area 3.5 miles from the bank and noticed that he appeared to match the description of one of the robbers. 669 F.2d at 1234. The officer told Booth that he matched the description, patted him down and placed him in handcuffs. *Id.* The officer then asked Booth for some biographical information and asked him what he was doing in the area and whether he had been arrested before. *Id.* Booth told the officer that he was visiting friends and that he had recently been paroled from prison for a burglary. *Id.* Booth was then taken to the bank for a "show-up" identification and, after some of the witnesses identified him as one of the robbers, was formally arrested and advised of his *Miranda* rights. *Id.* Booth successfully sought the suppression of his statements to the officer

regarding why he was in the area and whether he had previously been arrested.  *Id*. at 1235.  On appeal, the Ninth Circuit, in what it characterized as a "close call," found that the trial court was not clearly erroneous in its determination that the questions relating to Booth's arrest record and reason for being in the area were the "functional equivalent" of interrogation because they could reasonably be expected to produce "either a denial of complicity, an admission, or an alibi – that could later be used against him."  669 F.2d at 1238.  However, the court also concluded that the questions relating to Booth's age, identity and residence did not constitute interrogation.  *Id*.

In *Disla*, a search warrant was executed on an apartment and police discovered money and cocaine, along with several photographs of Disla.  805 F.2d 1340, 1342-43.  One of the officers on the scene, Officer Zamora, spoke with several neighbors and obtained descriptions of the individuals residing at the apartment.  *Id*. at 1343.  Disla and his brother then drove up to the apartment and Disla was arrested, searched, handcuffed and taken inside the apartment.  *Id*.  Before advising Disla of his *Miranda* rights, Officer Zamora asked Disla for his name, age, address and employment status.  *Id*. at 1343.  Disla told Officer Zamora that he resided at the apartment.  *Id*. at 1344.  Disla sought to have that statement suppressed, but his motion was denied by the district court and Disla was found guilty of possession of cocaine.  *Id*. at 1344-45.  On appeal, although ultimately finding the admission of the statement harmless, the Ninth Circuit concluded that the question from Officer Zamora about Disla's residence constituted an interrogation, explaining that "officer Zamora should have known that the question regarding Disla's residence was reasonably likely to elicit an incriminating response"

because "Zamora knew that a large quantity of cocaine and cash had been found at the . . . apartment and that the resident(s) of the apartment had not been identified." *Id*. at 1347. The court also found that the question about Disla's address was related to proving an element of the possession charge. *Id*.

These cases can readily be harmonized with the Government's contention that the Defendant here was not subjected to the functional equivalent of interrogation. *Foster* establishes that conversations unrelated to the charged crime, and being friendly, do not generally constitute interrogation or inducement under *Innis*. Under that authority, the agents in this case, by being friendly and giving the Defendant a sausage biscuit, could not have reasonably expected those actions to produce an incriminating statement.

*Booth* and *Disla* are readily distinguished from the facts in this case. Here, the agents never asked the Defendant for information at all. The Defendant's admissions were volunteered only after the agents provided him with information about the charges and penalties he faced. Those sorts of statements clearly fall outside the sort of statements that can reasonably be expected to produce and incriminating response. *See, e.g., United States v. Moreno-Flores*, 33 F.3d 1164, 1169-70 (9th Cir. 1994) (holding that describing the evidence against the defendant and telling him he was "in trouble" were not the functional equivalent of interrogation because they did not invite a response).

A good example of officers crossing that line appears in a contrasting but similar case decided by the Ninth Circuit. In *United States v. Padilla*, 387 F.3d 1087 (9th Cir. 2004), an FBI agent went to a state prison facility and placed the defendant under arrest pursuant to a federal arrest warrant for felon-in-possession charges. *Id*. at 1093. The

agent advised Padilla of the federal charges and told him he was being taken to make his initial appearance before the magistrate judge. *Id.* However, in what is apparently a common practice among federal agents, the defendant was not advised of his *Miranda* rights. *Id.* During the transport, the agent "said something to the effect that this was Padilla's last chance to cooperate" in the investigation of another criminal suspect. *Id.* In response to this statement, the defendant made incriminating statements. The Ninth Circuit held that the agent's "last chance to cooperate" statement constituted interrogation because the agent should have known that it was reasonably likely to elicit an incriminating response. *Id.* The court noted that it was difficult to imagine any purpose for such a statement other than to elicit a response. *Id.* Although many of the facts of *Padilla* are like those presented in this case, the agents here made no statement that even approaches the "last chance to cooperate" statement found to be the "functional equivalent" of interrogation in *Padilla*.

## III.   RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE

Based on the foregoing, the Magistrate Judge recommends that the District Court, after an independent review of the record, **grant** Defendant's Motion to Suppress Identification Evidence (Doc. 36), and **deny** Defendant's Motion to Suppress Statements (Doc. 35).

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment. However, the parties shall have fourteen (14) days from the date of service of a copy of

this recommendation within which to file specific written objections with the District Court.  *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have fourteen (14) days within which to file a response to the objections. No replies are permitted without leave of court.  If any objections are filed, this action should be designated case number: **CR 15-01632-TUC-RM**.  Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to de novo consideration of the issues.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 24th day of March, 2016.

Jacqueline M. Rateau
United States Magistrate Judge