1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

9   United States of America,                          No. CR-15-01632-001-TUC-RM

10                                    Plaintiff,        **ORDER**

11   v.

12   Prince Anthony Kelly,

13                                    Defendant.

14

15         Pending before the Court is a Report and Recommendation issued by Magistrate

16   Judge Jacqueline M. Rateau (Doc. 97).  In her Report and Recommendation, Judge

17   Rateau recommends that this Court grant Defendant's Motion to Suppress Identification

18   Evidence and deny Defendant's Motion to Suppress Defendant's Statements.   Both

19   parties have objected to Judge Rateau's recommendation, and this Court thus reviews

20   Defendant's Motions to Suppress de novo.  *See* 28 U.S.C. § 636(b)(1) ("A judge of the

21   court shall make a de novo determination of those portions of the report . . . to which

22   objection is made.")

23   . . .

24   . . .

25   . . .

26   . . .

27   . . .

28   . . .

## I.   Factual Background[1]

### A.   March 24, 2015

On the morning of March 24, 2015, two men entered a firearm store in Sierra Vista, Arizona.  (Tr. 2 at 5:22-25, 6:3-12; 38:7-11.)  During the Motions Hearings held before Judge Rateau, the store's salesperson Jennifer Stark testified that one of the men was African-American and the other was Caucasian.  (*See id.* at 4:17-18.)  The African-American man is referred to herein as "the Suspect" and is alleged to be Defendant Prince Anthony Kelly.   The Caucasian man has since been identified as Matthew Androsky.  (*See id.* at 95:24-96:4.)  Ms. Stark testified that her attention was drawn to the men because Mr. Androsky's attire made him appear out of place.  (*Id.* at 4:24-5:2.)  During the thirty to forty-five minutes that the men browsed the store, Ms. Stark handed them each eight to ten guns to examine.  (*Id.* at 10:10-18; 11:23-25.)   Ms. Stark remembers that the Suspect was very jovial, and smiled and laughed throughout the encounter.  (*Id.* at 13:5-8.)  The gun store is well lit and while the two men handled the guns, Ms. Stark was within three to five feet of the two men.  (*Id.* at 7:20-8:20; 11:4-8.)  Ms. Stark paid close attention while the guns were out to make sure the guns remained unloaded and none of the magazines were taken.  (*Id.* at 11:2-11.)  She testified that in keeping a close watch on the guns, she mainly looked at the guns and the men's hands.  (*Id.* at 104:5-23.)

Mr. Androsky ultimately asked to purchase a gun.  (*Id.* at 14:11-15.)  After Ms. Stark completed the sale to Mr. Androsky, the Suspect indicated that he too wished to purchase a gun.  (*Id.* at 22:14-16.)  The Suspect began to fill out the ATF form necessary to purchase the firearm, made a mistake and requested another form, and then decided that he wanted to wait to purchase the weapon because he needed to count his money.

---

[1] Neither party asked this Court to hold oral argument on their objections.  Given the thorough record created by the parties before Judge Rateau, further oral argument would not assist this Court in resolving the pending motions.  Accordingly, the facts recorded are taken from the sworn testimony and evidence entered during the Motions Hearings held by Judge Rateau on February 1, 2016, February 5, 2016, and March 1, 2016.

1   (*Id.* at 23:14-25:13.)  The two men left the shop.  (*Id.* at 37:11-12.)

2       The Suspect returned to the store around lunchtime with an African-American

3 man.  (*Id.* at 38:4-6, 16-22.)  The Suspect indicated that he wished to purchase the gun he

4 had previously indicated to Ms. Stark, and she took out the gun and provided him with

5 another form to complete.  (*Id.* at 40:15-18; 41:23-42:5.)   The Suspect made another

6 mistake on this form, and was handed a replacement.  (*Id.* at 42:10-43:7.)   After he

7 completed the form, Ms. Stark asked to see some identification and the Suspect handed

8 her an Arizona identification card.  (*Id.* at 51:14-22.)  The name the Suspect wrote on the

9 form was "Anthony J. Kelly."  Defense Exhibit 55.  Ms. Stark examined the picture on

10 the ID to make sure the information and picture depicted matched the Suspect and what

11 he wrote on the form.  (Tr. 2 at 17:17-18:11.)  Ms. Stark then called the National Instant

12 Criminal Background Check System ("NICS") to confirm that she could sell a gun to the

13 Suspect.   (*Id.* at 52:16-17.)   NICS told Ms. Stark they needed to further review the

14 Suspect's history before they could approve the sale.  (*Id.* at 15-16.)   Because this

15 response indicates that a sale might not go through that day, Ms. Stark removed the gun

16 from the counter and put it on a chair behind her.  (*Id.* 54:22-55:4.)  Ms. Stark then told

17 the Suspect that NICS had to conduct further review before she could sell him the gun

18 and he "lost his smile."  (*Id.* at 55:13-20.)  After a few minutes, NICS told Ms. Stark to

19 delay the sale, triggering a five-day waiting period before Ms. Stark could sell the gun to

20 the Suspect.  (*Id.* at 56:1-21.)

21       Ms. Stark informed the Suspect that if he wanted to put a deposit down, she would

22 hold the gun for him so he could purchase it after NICS approved the sale.  (*Id.* at 56:22-

23 24.)  Ms. Stark then asked for the Suspect's telephone number so she could call him when

24 she heard back from NICS.   (*Id.* at 57:12-15.)   Thereafter, the Suspect's companion

25 offered to fill out a form on the Suspect's behalf.  (*Id.* at 58:5-10.)  Ms. Stark informed

26 them that someone could not fill the form out on someone else's behalf.  (*Id.* at 58:6-7,

27 17-18.)  The two men then left the store.  (*Id.* at 59:24-60:1.)

28       The Suspect and his companion returned to the store less than thirty minutes later.

(*Id.* at 60:21-25.)  The Suspect told Ms. Stark he wanted his form back in a demanding tone.  (*Id.* at 61:16-17.)  When Ms. Stark responded that she could not give it to him because it was now federal property, he placed his hands on the counter in a way that made her believe he was going to jump over the counter.  (*Id.* at 62:8-9; 63:1-2.)  At this point, Ms. Stark thinks she managed to text the word "video" to her brother so he could turn on the security cameras in the store.  (*Id.* at 10-14.)  Ms. Stark testified that she was in fear for her life and backed away as far as she could.  (*Id.* at 63:15-16; 64:1-9.)  She also testified that she put her hand on her hip to demonstrate that she was armed.  (*Id.* at 63:15-16.)  The Suspect's companion grabbed the Suspect's shirt and guided him out of the store.  (*Id.* at 66:11-24.)  Ms. Stark testified that because she saw they were walking in the direction of a nearby gun store, she called the store to warn them that one of the gentlemen had previously offered to make a "straw purchase" for the other.  (*Id.* at 68:9-24.)

Shortly thereafter, Ms. Stark testified that the Suspect and his companion came back to the store, this time accompanied by a smaller African-American man and a Caucasian couple.  (*Id.* at 69:6-19.)  While in the store, the Suspect told the smaller African-American man he had tried to purchase a gun but had received a "delay" from NICS.  (*Id.* at 70:4-5.)  The Suspect's smaller companion responded that he had a gun at home he could sell to the Suspect, and the Suspect responded "Yes, let's do that."  (*Id.* at 70:5-6; 71:19-22.)  Ms. Stark testified that at this point she texted her brother for more video because she was in disbelief that they would have a conversation about the commission of a crime in front of her.  (*Id.* at 75:25-76:6.)  She said she was so "dumbfounded" that she did not say anything else to the group.  (*Id.* at 72:4-10.)  The group then left the store.  (*Id.* at 72:13-15.)  Ms. Stark testified that while the group was in the store, no guns were out.  (*Id.* at 135:3-14.)  This was the last time Ms. Stark saw the Suspect.  She later called an officer at the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to report what she had witnessed.  (*Id.* at 75:10-13.)

. . .

### B.    ATF Interview and Lineup

A few weeks later, Ms. Stark met with ATF Agent Heather Cox-McClain for an interview and to review a line-up.  (Tr. 3 at 76:16-24; Tr. 4 at 20:18-22.)  After Agent Cox-McClain interviewed Ms. Stark about the events of March 24, 2015, Ms. Stark sent Agent Cox-McClain a written statement, and Agent Cox-McClain typed a summary of the information Ms. Stark had recounted.  (Tr. 4 at 77:14-78:9; 81:1-6.)  Ms. Stark reviewed the summary and signed it.  (Tr. 3 at 136:20-137:3.)  At this point, the only description Ms. Stark had provided of the Suspect was that he had a similar height and build as the African-American companion who was with him the second, third, and fourth time Ms. Stark encountered him.  (Tr. 4 at 83:21-84:12.)

Agent Cox-McClain provided ATF Intelligence Research Specialist Dennis Fasciani with the name "Anthony Kelly" and the date-of-birth the Suspect filled out on the ATF form.  (Tr. 1 at 12:23-25.)  Mr. Fasciani composed a "six-pack," a one page sheet with a picture of the Defendant and five other presumably similarly looking individuals.  (*Id.* at 5:2-6, 16:21; 12:3-10.)  Mr. Fasciani uses pictures taken at Arizona Motor Vehicles Divisions for the lineups.  (*Id.* at 5:23-6:2.)  Mr. Fasciani placed the Defendant's Arizona ID picture in slot number one on the six-pack, that is, in the top left slot.  (*Id.* at 13:4-7.)  Placing a suspect or defendant in this first slot is Mr. Fasciani's standard practice when the Agent requesting the lineup does not specify where in the lineup the suspect should be placed.  (*Id.* at 5:13-15; 20:25-21:8.)  Mr. Fasciani has received no training on the lawful creation of a photographic lineup, or in particular, what it means to create a photographic lineup that is not impermissibly suggestive.  (*Id.* at 23:21-25; 24:18-23; 25:2-25.)

Agent Cox-McClain presented Ms. Stark with the lineup created by Mr. Fasciani.  (Tr. 4 at 22:17-19.)  Agent Cox-McClain has not received any training regarding how to conduct a lawful, unsuggestive photographic lineup.  (*Id.* at 60:7-61:19.)  Agent Cox-McClain testified during the hearings before Judge Rateau that she advised Ms. Stark she may or may not recognize anyone in the lineup.  (*Id.* at 62:2-6.)  Ms. Stark testified that

1   Agent Cox-McClain also advised her that the Suspect may or may not be included in the

2   six-pack. (Tr. 2 at 79:5-8.) Ms. Stark examined the six-pack and immediately crossed

3   out the individuals pictured in slots two through five. (*Id.* at 81:16-17; 82:1-7; *see also*

4   Tr. 4 at 23:16-24:13.) She studied the remaining two slots—slots one and six, for nearly

5   fifteen minutes, but ultimately stated she could not decide between the two. (Tr. 2 at

6   81:13-14; 82:8-11, 22-24.) She said that slot one had similar features as the Suspect, but

7   slot six had a similar expression. (*Id.* at 81:2-6; 83:2-7; *see also* Tr. 4 at 24:15-20.) At

8   some point while Ms. Stark was examining the six-pack, she mentioned to Agent Cox-

9   McClain that it was hard to identify the Suspect because he had been wearing a baseball

10  cap at the time of the incident. (Tr. 2 at 88:3-5; Tr. 4 at 62:21-25.) Agent Cox-McClain

11  then used a folder to simulate what slots one and six would look like with their foreheads

12  covered by a hat. (Tr. 2 at 88:7-9; Tr. 4 at 63:15-64:2.) Ms. Stark was still unable to

13  decide between the two pictures. (Tr. 2 at 88:10-11; *see also* Tr. 4 at 24:21-22.)

14  Shortly before the Motions Hearing before Judge Rateau, Ms. Stark met with

15  Agent Cox-McClain to prepare for her testimony. (Tr. 2 at 84:3-5; Tr. 4 at 69:22-70:1.)

16  Later that day, Ms. Stark's brother sent her a text message with a link to an article about

17  Defendant and a Caucasian woman who were arrested in Sierra Vista. (Tr. 2 at 84:8-

18  85:4; Tr. 4 at 69:14-70:5.) Ms. Stark immediately recognized the woman pictured as

19  being part of the couple who accompanied the Suspect into the store the last time she saw

20  him on March 24, 2015. (Tr. 2 at 85:2-11.) Ms. Stark then looked at the picture of the

21  Defendant and determined he was the Suspect. (*Id.* at 86:1-5.) Feeling that any

22  subsequent identification she might make of Defendant would be compromised by her

23  seeing the article, Ms. Stark called Agent Cox-McClain and reported the incident. (*Id.* at

24  86:22-87:6.) Ms. Stark remembers that she deleted the text message and was unable to

25  share it. (*Id.* at 86:25-87:2.) Agent Cox-McClain testified, however, that Ms. Stark

26  forwarded her the text and Agent Cox-McClain then informed the Government's counsel.

27  (Tr. 4 at 26:20-27:1; 70:19-25.)

28  . . .

### C.      *August 17, 2015 Transport*

On August 17, 2015, Agents Cox-McClain and Darren Clemons traveled to the Cochise County Jail where Defendant was being held on State charges that had recently been dismissed due to law enforcement corruption.   The Agents were tasked with executing an arrest warrant on Defendant and transporting him to federal court in Tucson, Arizona for processing.   On their way to the jail, the Agents stopped at a McDonalds to buy breakfast.   Agent Cox-McClain bought Defendant a sandwich because she thought he would appreciate it after spending months in jail. (Tr. 4 at 8:2-8.)   Agent Clemons testified that he believed Agent Cox-McClain bought the sandwich not only to help Defendant, but also to encourage Defendant to be friendly so they "wouldn't have any problems with him while transporting."  (Tr. 3 at 36:7-23.)

When they arrived at the jail, Agent Cox-McClain briefly told Defendant they had a warrant for his arrest and were transporting him to federal court.   After the Agents secured Defendant in Agent Cox-McClain's vehicle and began the two-hour ride to Tucson, Agent Cox-McClain told Defendant what would happen when he arrived at the federal courthouse.   Among other procedural details, Agent Cox-McClain informed Defendant he was entitled to either choose an attorney or have an attorney appointed to represent him during the afternoon's hearing.   At no point did either Agent advise Defendant of the rights detailed in *Miranda v. Arizona*, 384 U.S. 436 (1966).   Both Agents testified that their personal preference is to not advise persons picked up from another agency's custody of their *Miranda* rights.  (Tr. 3 at 55:19-25. Tr. 4 at 34:22-35:6.)

After Agent Cox-McClain detailed the process for Defendant, she gave him the arrest warrant, explained the charges to him, and explained the basis of these charges.   In particular, she told Defendant he was being charged with "providing a false statement in connection with the purchase of a firearm, specifically that he check[-]marked 'No' when the question was, 'Have you ever been convicted of a previous felony.'" (Tr. 4 at 13:1-6.) Defendant responded to Agent Cox-McClain by saying he thought he was fine to

purchase a firearm because he was "off-paper."  (*Id.* at 15-17.)  Agent Cox-McClain asked Defendant what "off-paper" meant, and Defendant responded "off parole."  (*Id.* at 13:15-20.)  Agent Cox-McClain advised him that he was mistaken and that he had to either receive a pardon or have his rights restored before he could attempt to purchase a gun.  (*Id.* at 21-23.)  Defendant appeared to misunderstand the charge and asked if the offense was a misdemeanor.  (Tr. 3 at 13:9-11.)  Both Agents responded that it was not a misdemeanor, but a felony charge.  (Tr. 3 at 13:9-14; Tr. 4 at 14:3-7.)  Agent Cox-McClain explained he could face up to ten years imprisonment.  (Tr. 4 at 14:7.) Defendant stated that "it was just a piece of paperwork" and that he did not actually get the gun.  (Tr. 3 at 13:19-25.)  Defendant then stated "I guess this one's on me.  I didn't know I could get in trouble for trying to buy a gun."  (Tr. 4 at 14:8-10.)  Agent Cox-McClain testified that it was after this conversation that she gave Defendant the McDonald's sandwich.  (Tr. 4 at 16:13-17.)  Agent Clemons testified that Agent Cox-McClain offered Defendant the sandwich within five minutes of leaving the jail.  (Tr. 3 at 45:20-24.)

Soon after this discussion, Defendant asked if there was anything that he could do to ensure that he got out of jail on bond later that day.  (Tr. 4 at 19:1-4; 56:18-23.) Defendant offered to give the Agents information about corrupt officers in Sierra Vista where both Agents are assigned.  (Tr. 3 at 3:2-3; 14:11-17; 19:15-23; 20:20-22; 56:17-57:18. Tr. 4 at 17:2-11; 19-4-8; 54:6-18; 56:18-57:3; 75:6-7.)  At some point in this discussion, Agent Clemons asked Defendant why his state charges had been dropped. (Tr. 3 at 19:15-17.)  As Defendant began to go into the details of how he could help the Agents in exchange for being released on bond, the Agents cut him off and told him that he should talk to a lawyer first so the Defendant "could be protect[ed]" and the Agents would be "covered."  (Tr. 3 at 20:1-5.  Tr. 4 at 17:10-17; 56:13-23; 57:4-58:16.)

Prior to transporting Defendant from the Cochise County Jail to the federal courthouse in Tucson, Arizona, Agents Cox-McClain and Clemons received training to learn how to encourage suspects to admit their wrongdoing or otherwise make

incriminating statements.[2]  (Tr. 3 at 33:11-24; Tr. 4 at 29:18-24.)  Part of this training instructs officers to "lay the groundwork for a conversation" with a suspect or defendant by "letting a defendant know he's in trouble."  (Tr. 3 at 34:11-17.)  Further, the training instructs them to develop friendly rapport with individuals and offer some sort of help so the suspects may be more engaging and offer incriminating statements.  (Tr. 3 at 34:18-35:2, 10-18.)  Separate from this training, there was also evidence admitted that when suspects cooperate with law enforcement, they frequently incriminate themselves in providing their knowledge of criminal activity.  (Tr. 3 at 57:24-59:8.)

## II.    Motion to Suppress Identification Evidence

Defendant challenges the identification evidence and asks this Court to suppress the lineup evidence and to preclude Ms. Stark from offering an in-court identification.  A court reviewing a defendant's motion to suppress identification evidence must answer two questions.  First, the court must determine whether the procedures used by law enforcement to obtain the identification were unnecessarily or impermissibly suggestive. *Perry v. New Hampshire*, 132 S. Ct. 716, 722 (2012).  Second, and only if the court answers the first question in the affirmative, the court must determine whether the totality of the circumstances demonstrates there is "a very substantial likelihood of irreparable misidentification."  *Id.* at 720, 722; *see also United States v. Carr*, 761 F.3d 1068, 1074 (9th Cir. 2014) ("An identification procedure is suggestive when it emphasizes the focus upon a single individual thereby increasing the likelihood of misidentification.").

Defendant argues Mr. Fasciani and Agent Cox-McClain's composition and use of the photographic lineup was impermissibly suggestive for seven reasons: (1) both Agent Cox-McClain and Mr. Fasciani had received no training in the proper considerations and procedure to create a lineup that is not impermissibly suggestive; (2) the picture of Defendant was the same picture presented to Ms. Stark during the commission of the alleged crime; (3) Defendant's picture was placed in slot number one; (4) Defendant's

---

[2] Agent Cox-McClain testified that she received the training within the last year, but nevertheless could not remember the details of the training.  (Tr. 4 at 30:10; 31:20.)

picture was the only picture with a blue background; (5) Defendant was the only individual depicted in the lineup wearing a necklace; (6) the admonition Agent Cox-McClain gave to Ms. Stark before showing her the six-pack was insufficient; and, (7) Agent Cox-McClain's simulation of a ball cap during the photographic lineup was improper.

This Court finds the details highlighted by Defendant do not render the identification process impermissibly suggestive. Simulating the baseball cap that Ms. Stark stated the Suspect was wearing has not been shown to be any different than requiring persons presented in an in-person lineup to dress as a suspect was seen or say something a suspect said. Defendant has provided no authority to persuade this Court that the ball cap simulation was impermissibly suggestive in any other way. Similarly, Defendant has not shown that Agent Cox-McClain's admonition to Ms. Stark that Ms. Stark may or may not recognize anyone in the lineup was legally insufficient. *Cf.*, *Carr*, 761 F.3d at 1076 (lack of any admonition was not sufficient to render an identification unduly suggestive).

It would be impermissible for Defendant's picture to be the only picture in the six-pack depicting jewelry if Ms. Stark had told Agent Cox-McClain the Suspect was wearing jewelry at the time of the offense. But, Ms. Stark gave no such description before she was shown the six-pack. It was not until Ms. Stark testified before Judge Rateau that she mentioned she remembered the Suspect wearing a necklace. Because Agent Cox-McClain and Mr. Fasciani had no way to know that the Suspect they were seeking to identify wore any jewelry, they cannot be said to have created an impermissibly suggestive line-up because Defendant is pictured wearing a necklace.

Neither the color of the background in Defendant's picture, nor its placement in slot number one caused the lineup to be impermissibly suggestive. There is nothing inherently suggestive about being in the first position of a six-pack. And, given the six pictures' varying backgrounds, lighting, and zoom, the fact that the background in Defendant's picture is blue does not improperly suggest that Defendant is the Suspect.

- 10 -

Defendant compares the use of his Arizona ID picture in the six-pack to various cases finding undue suggestion.  However, those cases all involve a fact that significantly distinguishes them from the case at hand.  Courts have reviewed various identification procedures and found them improperly suggestive when *officers create* multiple opportunities for a witness to view a defendant, in the midst of viewing other individuals only once.  *See, e.g.*, *Foster v. California*, 394 U.S. 440, 442-43 (1969); *Neil v. Biggers*, 409 U.S. 188, 193-99 (1972) (finding identification procedure was unlawfully suggestive, but declining to exclude the identification because it was otherwise reliable).  The police's conduct in those cases caused impermissible suggestion because showing a witness one picture repeatedly among many other pictures that the witness only sees once, can lead that witness to identify a defendant based solely upon the familiarity that comes with seeing a picture multiple times.  *See, e.g.*, *Foster*, 394 U.S. at 441-42.  But, here, the police did not present a picture of Defendant to a witness multiple times.  Rather, they used an official picture, which they obtained through their standard procedure of using Arizona Motor Vehicles Divisions pictures.  Accordingly, the holdings of cases such as *Foster* and *Biggers* have little bearing in this matter.  That Ms. Stark may have witnessed the same photograph during the commission of the crime is similar to her witnessing any other physical characteristic during the commission of the crime.  This cannot support a finding that the officers' identification procedures were improper.

Finally, the Court must address Defendant's contention that the identification procedures were rendered unlawfully suggestive because neither the individual creating the six-pack, nor the individual conducting the photographic line-up with Ms. Stark, received any training or instruction on lawful means to perform those duties.  It concerns this Court that despite the many opinions discussing the potential for improper identifications, the ATF officers involved have no apparent understanding of the law on this matter.  While this troublesome ignorance may very well lead to the use of impermissibly suggestive procedures, it does not appear that the procedures in this case

1    rose to that level.

2         Because this Court finds the identification procedures were not impermissibly

3    suggestive, this Court does not consider whether the circumstances of Ms. Stark's

4    identification are reliable.  *See, e.g.*, *Perry*, 132 S. Ct. at 720-21, 728-29.  Accordingly,

5    the Court will leave the reliability of Ms. Stark's testimony and any potential

6    identification for the jury to consider after presentation of all relevant evidence.

7    **III.    *Motion to Suppress Defendant's Statements***

8         Defendant argues the statements he made during the August 17, 2015 transport

9    should be suppressed because Agents Cox-McClain and Clemons did not advise him of

10   his rights according to *Miranda v. Arizona*, 384 U.S. 436 (1966).  *Miranda* requires law

11   enforcement to advise any person in their custody of various rights before they begin an

12   interrogation.    384 U.S. at 444-445.  The Supreme Court defined "interrogation" in

13   *Rhode Island v. Innis* and determined that it was not limited to express questioning, but

14   also included questioning's functional equivalent.  *See* 446 U.S. 291, 300-01 (1980).

15   Thus, "any words or actions on the part of the police (other than those normally attendant

16   to arrest and custody) that the police should know are reasonably likely to elicit an

17   incriminating response from the suspect" qualify as "interrogation" and trigger a person's

18   right to hear the warnings detailed in *Miranda*.  *Id.* at 301.  When considering the effect

19   that certain conduct or statements would have on a suspect, the Court instructed that the

20   focus should be on the suspect's state of mind and not the officer's specific intent.  *Id.* at

21   301.  The Court further elaborated that "where a police practice is *designed* to elicit an

22   incriminating response from the accused, it is unlikely that the practice will not also be

23   one which the police should have known was reasonably likely to have that effect."  *Id.* at

24   301 n.7 (emphasis added).

25        It is undisputed that Agents Cox-McClain and Clemons did not inform Defendant

26   of the rights described in *Miranda*.  It is also undisputed that Defendant was in custody

27   for the two hours while the Agents transported him from the county jail to the federal

28   courthouse.  All that remains is whether Agents Cox-McClain and Clemons's conduct

rose to the level of "interrogation" as defined by *Innis*.

During the motions hearings conducted by Judge Rateau, Defendant entered evidence regarding Agents Cox-McClain and Clemons's law enforcement training and experience.  In particular, both Agents attended the Reid Interview School and learned various techniques to cause suspects to "admit their wrongdoing" and make "incriminating statements." (Tr. 3 at 33: 16-24.)  For example, the Agents were taught to emphasize how much trouble a suspect is in to get him or her to talk with the agents.  (*Id.* at 34:11-17.)  Additionally, the Agents were taught to develop a rapport with suspects so that the suspects trust them and are more willing to talk.  (*Id.* at 34:18-35:13.)  The Agents were also taught that offering to help a suspect may make the suspect more engaging with law enforcement.  (*Id.* at 35:14-18.)

The record is clear that Agents Cox-McClain and Clemons used these techniques with Defendant while they drove the two hours from the Cochise County Jail to the Tucson Federal Courthouse.  The Agents knew Defendant had been in a county jail for several months, had been in and out of custody numerous times before, and that his most recent time in custody was the result of a county officer who was being investigated for corruption.  (Tr. 3 at 36:7-10; Tr. 4 at 17:5-9, 18:2-13.)  With this knowledge, Agent Cox-McClain engaged with Defendant beyond her standard protocol of explaining the process of the day and thereby encouraged Defendant to be friendly, talkative, and responsive to the information provided to him.  And, in line with their training, Defendant responded to the information provided by the Agents with incriminating statements.

This Court of course does not conclude that offering food in consideration of the long day that was before Defendant, or attempting to otherwise be kind to Defendant was unlawful or improper.  Rather, the evidence shows the Agents should have known that their conduct, in particular, beginning an in-depth conversation about the extent of time Defendant could serve if convicted as charged and the evidence against him, would produce incriminating statements.  They should have known this was reasonably likely to

elicit incriminating statements because their training instructed them that such conduct often elicits incriminating statements.  Relevant precedent requires this Court to find that this conduct, which was designed to bring out incriminating statements, fits within *Innis*'s definition of "interrogation."  *See, e.g.*, *United States v. Theirman*, 678 F.2d 1331, 1335 (9th Cir. 1982) ("Police practices designed to elicit an incriminating response will normally be deemed interrogation."); *see also United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981) (acknowledging a distinction between the "routine gathering of background biographical data" or other information attendant to arrest, and statements made "under the guise of seeking 'objective' or 'neutral' information, [but] deliberately [intended to] elicit an incriminating statement from a suspect.").

Additionally, it is clear that Agent Cox-McClain's question as to what "off-paper" meant, which was asked in the midst of an in-depth conversation that she initiated about Defendant's charges, also qualifies as "interrogation" of its own right.  In *United States v. Disla*, the Ninth Circuit held that an officer should have known that a question posed to the suspect that was obviously relevant to an element of the charge would elicit an incriminating statement.  805 F.2d 1340, 1347 (9th Cir. 1986) (ultimately concluding the trial court's admission of the statement was harmless).  Similarly, here, Agent Cox-McClain's probe into Defendant's offered defense for the alleged crime falls within *Innis*'s definition of "interrogation."  Accordingly, even if the Agents' conduct was not designed to elicit an incriminating response from Defendant and thus the functional equivalent of interrogation, this Court would still find that any statements made after Agent Cox-McClain questioned Defendant about being "off-paper" must be suppressed. This Court thus grants Defendant's Motion to Suppress as to his statements made during transport.

. . .

. . .

. . .

. . .

- 14 -

1    Accordingly,

2        **IT IS HEREBY ORDERED** that the Report and Recommendation (Doc. 97) is

3    **rejected**.

4        **IT IS FURTHER ORDERED** Defendant's Motion to Suppress Identification

5    Evidence (Doc. 36) is **denied**.

6        **IT IS FURTHER ORDERED** Defendant's Motion to Suppress Statements (Doc.

7    35) is **granted**.

8        Dated this 3rd day of June, 2016.

9

10

11    _____
      Honorable Rosemary Marquez
12    United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28